AUSA:   Mark Bilkovic            Telephone:  (313) 226-9623
Task Force Officer:   Brandon Leach, DEA      Telephone:  (571) 362-1704

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

| | |
|---|---|
| United States of America<br>v.<br><br>Ylli DIDANI | Case: 2:21−mj−30148<br>Assigned To : Unassigned<br>Assign. Date : 3/26/2021<br>Description: IN RE: U.S. v. DIDANI<br>(CMP)(MEV) |

Case No.

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ 2016 to present _____ in the county of __ Wayne and elsewhere __ in the __ Eastern __ District of _____ Michigan _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841 and 846 | Conspiracy to distribute controlled substances |
| 46 U.S.C. § 70503 | Conspiracy to distribute controlled substances on board a vessel subject to the jurisdiction of the United States |
| 18 U.S.C. §§ 1956(a) and 2 | Money laundering |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Brandon Leach, Task Force Officer, DEA
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date:  March 26, 2021

_____
*Judge's signature*

City and state:  Detroit, MI

Hon. Kimberly G. Altman, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Brandon Leach, having been duly sworn, depose and state as follows:

1.      I am a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA) assigned to the Detroit Field Division, which is located in the Eastern District of Michigan.  As such, I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United Code, Section 2510(7), that is, an officer of the United States who is authorized by law to conduct investigations of and to make arrests for offenses enumerated in Title 18 and 21 of the  United States Code.

2.      I have been a police officer with the Farmington Hills Police Department in Oakland County, Michigan since May 2006. Since June 2016, I have been assigned to the DEA, as a duly sworn Task Force Officer (TFO). During the course of my law enforcement career, I have received specialized training in the utilization, preparation, and execution of search and seizure warrants at the DEA's Detroit Field Division Office, and have subsequently executed search and seizure warrants for cellular devices, narcotics, dangerous drugs, and the records, books, and proceeds derived as a result of illegal drug trafficking. In addition, I have attended multiple training seminars and schools geared toward narcotic investigations, including the Michigan State Police Basic Investigator School, Street Crimes Seminar and Fortis Group Advance Narcotics Workshop.  I am

1

currently assigned to DEA Detroit Group 6.  As such, I am a "federal law

enforcement officer" as defined in Federal Rule of Criminal Procedure 41(a)(2)(C).

I have participated in over 200 investigations involving the violation of State and

Federal controlled substance laws, which have led to the arrest of numerous

individuals.  I have been involved in numerous executions of State and Federal

search warrants, which resulted in the seizure of controlled substances, materials

used to cut narcotics, packaging equipment and materials, drug paraphernalia,

weighing instruments, narcotic tabulations, telephone codes, maps, and

documentary evidence relating to drug trafficking activities.  I have also utilized

numerous confidential informants, and have also been involved in controlled

deliveries of controlled substances. I have received specialized training in the field

of drug trafficking and money laundering from the DEA's basic and advanced

narcotic courses and the Farmington Hills Police Department.

     3.     During the course of my assignment as a Task Force Officer with the

DEA, I have worked with federal, state, and local law enforcement officers in the

Eastern District of Michigan, and elsewhere.  These diverse personnel provide the

DEA with an extensive breadth of experience and knowledge about illegal

interstate and international drug trafficking.  Based on my experience and the

experience of others, I am familiar with matters including, but not limited to, the

means and methods used by persons and drug trafficking organizations to

2

purchase, transport, store, and distribute drugs and to hide profits generated from those transactions.

4.     This affidavit is submitted in support of an arrest warrant for Ylli DIDANI.  For the reasons set forth below, I have probable cause to believe that the defendant, Ylli DIDANI (DIDANI): (1) knowingly, intentionally and unlawfully conspired with members of a transnational Drug Trafficking Organization (DTO), known and unknown, to commit violations of Title 21, United States Code, Sections  841 and 846 (conspiracy to distribute controlled substances); (2) knowingly, intentionally and unlawfully conspired with members of a DTO known and unknown, to commit violations of Title 46, United States Code, Section 70503 (conspiracy to distribute controlled substances on board a vessel subject to the jurisdiction of the United States); (3) aided and abetted members of the DTO, known and unknown, in committing violations of Title 18, United States Code, Sections1956(a) and 2 (money laundering); and (4) committed these offenses in the Eastern District of Michigan and elsewhere.

5.     The statements contained in this Affidavit are based on my experience and background as a law enforcement officer, my personal role in this investigation, information provided to me by other law enforcement officers, my review of information obtained from other law enforcement officers, authorized search warrants, as well as information provided by cooperating individuals.

## PROBABLE CAUSE

6.      Since  January 2015**,** the DEA has been working with the United

States Border Patrol (USBP), Homeland Security Investigations (HSI), the Internal

Revenue Service (IRS), and other federal, state, and foreign law enforcement

agencies in conducting an international investigation into Ylli DIDANI and a DTO

led by DIDANI. The investigation has revealed that the DTO has organizational

ties to the United States, Colombia, Ecuador, Mexico, Canada, Chile, Albania,

Turkey, Brazil, Germany, Dominican Republic, United Arab Emirates, Belgium,

Spain and the Netherlands. Throughout this investigation, investigators have

interviewed multiple suspects and cooperators, executed numerous search warrants

and have seized dozens of items including illegal controlled substances, numerous

physical and electronic documents, and electronic devices, such as cellular

telephones and lap top computers. Investigators were further able to determine that

domestic and international drug traffickers, including DIDANI are in

communication with Colombian, Ecuadorian, Mexican, Dominican Republic and

Albanian-based members of the DTO. Through my training and experience, I

know that Colombia, Ecuador, and Mexico are source countries for controlled

substances, including but not limited to cocaine.

7.      In July 2015, investigators were alerted via law enforcement databases

that DIDANI, an associate of the aforementioned DTO, would be attempting to

enter the United States on July 30, 2015 at Chicago O'Hare International Airport on an inbound flight originating from Albania.

8.      Research of DIDANI revealed multiple law enforcement reports indicating that DIDANI has a pattern of suspicious international travel and has been the subject of multiple investigations that pertain to money laundering, drug smuggling, and the use of steroids.

9.      Upon DIDANI's arrival at Chicago O'Hare International Airport, he was referred to a secondary inspection and interviewed by United States Customs and Border Patrol (CBP). DIDANI had an iPhone cellular telephone and a Blackberry cellular telephone in his possession. DIDANI was released from secondary inspection after the interview.

10.     CBP conducted a border search of DIDANI's iPhone upon arrival to the United States prior to his release. During the search of DIDANI's iPhone, investigators located multiple pictures of DIDANI with large amounts of bundled/rubber banded United States currency, along with pictures of DIDANI holding what appears to be an assault rifle and a semi-automatic handgun:

5



11.     During DIDANI's interview, he stated that he was coming into the United States to visit family and friends and planned to return to Albania in approximately 1-1.5 months to continue working on his coal business operation that he had bought into for $100,000 in U.S. Currency (USC).

12.     DIDANI has a prior felony conviction that prohibits him from possessing firearms. Specifically, a criminal history query revealed that on November 22, 2005, DIDANI was convicted of operating while intoxicated, third or subsequent offense, in the Sixth Circuit Court in Pontiac, Michigan. The crime of operating while intoxicated, third or subsequent offense is a felony in Michigan, punishable by up to five years in prison. Given this conviction for a crime

6

punishable by imprisonment for more than one year, DIDANI is prohibited from possessing firearms in the United States.

13.     On August 6, 2016, Ylli DIDANI arrived in the United States at Chicago O'Hare International Airport on an inbound flight originating in Rome, Italy.

14.     Upon arriving at Chicago O'Hare International Airport, DIDANI was greeted by CBP Officers and referred for a secondary inspection and interview.

15.     During the secondary inspection, which included an examination of DIDANI's luggage, officers discovered seven vials of Kigtropin, or Human Growth Hormone. Since it is illegal in the United States to possess the controlled substance Kigtropin, all seven vials were seized by CBP. During the inspection, DIDANI was also found to be in possession of two cell phones, an Apple iPhone and a Blackberry cellular telephone. During the interview process DIDANI unlocked his iPhone, allowing authorities to review the data located within.

16.     During a review of DIDANI's seized iPhone, investigators located several pictures saved on the phone showing large sums of bundled $100 and $20 bills laying on counters and desks. Investigators observed two specific photos that were date and time stamped, June 9, 2016, 4:48 p.m. and 5:21 p.m. Investigators observed the geo tag attached to the pictures which showed they were taken at an apartment known to investigators in Macomb County, Michigan. At the time, a Co-

7

Conspirator (CC-1) was renting the apartment.

17.     In addition, on multiple occasions during the summer of 2016, law enforcement observed DIDANI and CC-1 at CC-1's apartment. The photos of bulk currency geo-tagged at CC-1's apartment June 9, 2016 are displayed below:

 

18.     During the review of DIDANI's iPhone, investigators located a Viber text message thread. Viber is a downloadable application utilized to communicate through undetectable means utilizing encryption-based software. The Viber thread spanned from July 5, 2016 through August 5, 2016. The thread was between DIDANI and the username "Dan Dan" which agents have identified as CC-1.

8

19.     The contents of the Viber thread contained messages between DIDANI and CC-1 that discussed a variety of topics involving the illegal movement of money, the receipt of packages via FedEx, the creation of fraudulent passports and the sale of bulk cocaine. Below are some of the pertinent messages in the Viber thread between DIDANI and CC-1 ((In the original thread, CC-1 listed his address, which I have not included. Instead, I have replaced the address with *******):

**July 14, 2016**

DIDANI:     Do you have the other phone with you? I need to register that as signal.

*CC-1*:     The burnout cell? No.

DIDANI:     You have that home?

*CC-1*:     Yes but I have to buy monthly minutes. U want to talk to me on that?

DIDANI:     I'm gone try my fathers number. Yes. Need to send u pic. I cant register signal here not sure why.

*CC-1*:     ******* Fraser, MI 48026. U gonna send me something today? I don't have $45 to even put mins on that phone.

DIDANI:     I try the latest tom, im waiting on someone to get clean money and send the order.

*CC-1*: U can send me cash in fed ex packet inside magazine?

DIDANI:     Yesss. I will brother.

9

*CC-1*: Ok. Lmk. Its all starting to workout brother!!

20.    Based on my training, experience and knowledge of this case, I believe that in the above thread, DIDANI was attempting to talk to CC-1 on a separate phone utilizing an encrypted application known as Signal. CC-1 refers to the other phone as the "burnout" phone. I am aware that subjects involved in criminal activity often carry an additional phone(s), such as a pre-paid phone that is not subscribed to them to communicate with other members of their criminal organization. This is done in an attempt to keep their names removed from any illegal activities and thwart law enforcement entities attempts to identify subjects involved in illegal activity. Additionally, DIDANI refers to getting "clean" money to send to CC-1. CC-1 recommended sending money hidden inside of a magazine sent via FedEx. I know that "clean money" is a term used by criminals to describe converting illegally obtained money, or "dirty money" (typically from the sale of drugs) to money that looks like it was earned legitimately, or "clean money", a form of money laundering.

21.    In the same July 14, 2016 text thread, at 2:59 p.m., DIDANI sent CC-1 a photograph. The photograph is a picture of a Blackberry cellphone displaying a picture of a red duffle bag containing multiple rectangular shaped packages wrapped in red and yellow packaging.



22.     Through my training and firsthand experience, the packages that appear in the photograph contained in the duffle bag are consistent with that of kilogram quantity sized packages which are commonly utilized to transport bulk quantities of drugs, more specifically cocaine. In the picture it appears that the duffle bag contains at least four yellow packages and seven red packages.

23.     The following text messages followed the picture in the Viber thread:

DIDANI:   Delete that
DIDANI:   Fucket i send it now
DIDANI:   Just got the email
*CC-1*:      ok
DIDANI:   Just email u something
*CC-1*:      Ms photo
DIDANI:   Thats ur house

11

24.     On July 14, 2016, at 4:13 p.m., DIDANI emailed CC-1 the exact same picture of the duffle bag containing what I believe are kilogram sized packages of suspected cocaine described above. CC-1 replied in the Viber thread, that he received the email and that he deleted the message.

25.     A portion of the July 14, 2016 Viber thread references a text message sent by DIDANI to CC-1 where DIDANI stated, "Thats ur house." DIDANI sent this text right after he sent CC-1 a picture of a duffle bag containing suspected kilograms of cocaine. It is my opinion that the context of the message was insinuating that the money made from the sale of the suspected cocaine was large enough that CC-1 would be able to purchase a house.

26.     Investigators have learned that DIDANI and other members of the DIDANI DTO have utilized Blackberry "PGP" cellular telephones with encryption software to coordinate criminal activity and avoid detection or interception by law enforcement. Agents observed DIDANI in possession of a Blackberry PGP cellular telephone on August 6, 2016, when he was interviewed by authorities at the Chicago O'Hare International Airport.

27.     On July 19, 2016, DIDANI texted CC-1 in the Viber application stating, "Get with marty asap." CC-1 responded with, "How can we talk freely when I get with M?"  DIDANI then sent multiple pictures of text messages on what appear to be DIDANI's identified encrypted Blackberry cellular telephone.

12

The screenshots show a conversation discussing locating someone to help move "100M euros" from the Deutsche Bank in Frankfurt Germany to a bank in Dubai, discreetly and without the bank reporting the transactions. The messages state that they will pay "us" 15% for the transaction.

28.     Investigators have identified a "Marty" and "M" referred to above as another Co-Conspirator (CC-2) who was financing a large portion of the illegal activity of the DIDANI DTO and had given large sums of money to CC-1 in the form of cashier's checks and personal checks. Some of these transactions took place in Wayne County, Michigan.

29.     During 2016 and 2017, investigators identified that CC-1 began receiving personal checks and cashier's checks in large amounts from CC-2. Starting in June of 2016, CC-1 cashed numerous checks totaling $864,000 from CC-2. These transactions are listed below:

     a.  June 9, 2016 – CC-1 cashed two $50,000 cashier checks.

     b.  October 31, 2016 – CC-1 cashed one $100,000 cashier check.

     c.  March 24, 2017 – CC-1 cashed four $50,000 cashier checks.

     d.  December 2, 2017 – CC-1 cashed one $14,000 cashier check.

     e.  December 19, 2017 – CC-1 cashed one $100,000 cashier check and one $80,000 cashier check.

     f.  December 21, 2017 – CC-1 cashed two $100,000 cashier checks and one $70,000 cashier check.

30.     CC-1 cashed several of these cashier checks at pawn shops and gold exchange businesses in the metro Detroit area. Through training and experience, I am aware that drug traffickers often utilize these types of businesses, instead of official banks, to launder drug proceeds in an attempt to remain undetected by law enforcement.

31.     CC-1 cashed the first two cashier's checks issued to him by CC-2 on June 9, 2016 totaling $100,000 USC. This is the same date that the bulk currency photos located on DIDANI's iPhone were taken at CC-1's residence described above.

32.     On December 21, 2017, after cashing the final checks CC-1 received from CC-2, CC-1 flew in a private plane owned by CC-2 to Washington D.C. to meet with DIDANI. On the evening of December 21, 2017, CC-2 met with DIDANI and gave him the bulk currency obtained from the cashed checks he cashed on December 19 and 21, 2017.

33.     In addition to the funds provided to CC-1, research has shown that CC-2 also engaged in the following transactions:

     a.  June 19, 2017 – CC-2 wired $330,000 to Tirana, Albania to a person with the purported name known to investigators.

     b.  July 31, 2017 –CC-2 wired $500,000 to Tirana, Albania to a person with the same purported name known to investigators described in Paragraph 33(a).

14

   c.  September 5, 2017 – CC-2 wired $500,000 from his personal checking account to himself in Tirana, Albania.

   d.  September 7, 2017 – CC-2 wired $500,000 that he obtained on September 5, 2017 to Ylli DIDANI in Albania.

34.    On August 12, 2017, in between the transactions in Paragraphs 33(b) and (c), CC-2 departed Detroit, Michigan in route to Tirana, Albania. CC-2 returned to Detroit from Albania on August 16, 2017. On August 17, 2017, records show that DIDANI sent CC-2 a package from Tirana, Albania to CC-2's primary residence, in Grosse Pointe Park, MI. Research showed that the package was identified as containing "computer and personal items." Additionally, on August 22, 2017, CC-2 received another package from Albania, reported as a package containing "cards and papers."

35.    Through training and experience, I am aware that drug traffickers and money launderers often do not travel with electronics that they know can be searched at the international border. Instead, they will ship their electronics to their destination in order to remain undetected by law enforcement. Additionally, drug traffickers and money launderers will send the passwords to unlock the devices in a separate package so that law enforcement cannot gain access to the information.

36.    In addition to providing finances to the DTO for the purchase of cocaine in South America, CC-2 conspired with DIDANI for the design and creation of an underwater parasitic drone to be utilized for the storage and

transportation of large quantities of cocaine. The drone (also referred to as the "torpedo") design was intended to attach to the bottom of a maritime cargo vessel via magnets. The drone was to possess an underwater modem and GPS antenna that could communicate with an operator electronically from a large distance away. The drone was intended to be remotely operated and could release from the vessel at the request of the operator and would send up a GPS location beacon to identify its current location. The DTO would then send out a fishing boat to the location of the drone, approx. 100 miles off the coast of Europe to retrieve the cocaine filled drone and avoid detection and interception by law enforcement entities.

37.     Investigators intercepted communications between CC-2 and DIDANI spanning May 2016 through June 2018 discussing payment to a company known to investigators. This company will be referred to as "the Company" throughout this affidavit. Further investigation revealed that CC-2 had been in communication with the Company under the alias of "Dale JOHNSON." In the spring of 2016, the Company had been hired by "Dale JOHNSON" (CC-2) and his "partners" to create an underwater hull scrubber device. Over the next two years the Company and CC-2 continued communications as the "scrubber" was designed and a prototype was created. CC-2 provided the overall approximate dimensions of the prototype to the Company along with the dimensions needed for a "void" that was necessary. The Company was not aware that the prototype was going to utilized for illegal

16

purposes. Between May 2016 and June 2018, the DIDANI DTO provided the Company over $12,000 in payments for the design and prototype model of the parasitic drone that the Company was creating.  These payments were in multiple forms, including a wire transfer from an Albanian bank account, money orders and cryptocurrency deposits. Communications regarding these payments were communicated between DIDANI and CC-2 prior to transferring the funds to the Company. In addition to the communications involving payment.

38.    Investigators have also identified multiple text messages between DIDANI and members of the DTO discussing a "torpedo" and how it would be utilized. I believe that the "torpedo" mentioned in the text messages was referring to the prototype drone that the Company was designing for CC-2. Investigators also obtained computerized drawing and hand sketches of the prototype drone, the overall dimensions of the unit and the capacity of cocaine that it could contain. The following photographs contain some of those text messages, notes describing the overall dimensions of the drone needed to be and the capacity of cocaine that the drone could contain:

17





To remind you of the design shapes:

**Initial design:**



**Updated design:**



18

39.     On July 20, 2018, CC-2 was killed in a plane crash. After CC-2's death, all communications between "Dale JOHNSON" and the Company stopped.

40.     Investigators received multiple photographs of the prototype created by the Company, which was still in the testing phases. The full-size drone was never completed due to lack of funds received and the loss of communication because of CC-2's death. Below is a photograph that investigators obtained from the Company of the prototype the Company was designing for CC-2.



41.     Through interviews, cooperator statements, execution of subpoenas and search warrants and the return of electronic data, investigators have been able to identify that the funds provided to DIDANI by CC-2 and facilitated by CC-1 within the Eastern District of Michigan were for the purchase of bulk quantities of

cocaine, sourced from South American countries and transited to European countries to be sold. Furthermore, investigators have located electronic and physical documents showing that CC-2 had in-depth knowledge of the workings of the organization and the purpose of the transferred funds being transferred to DIDANI.

42.    After the unexpected sudden death of CC-2, the DIDANI DTO needed a new financier for the organization. DIDANI's international travel grew exponentially, including the United States, Albania, Spain, Netherlands, Dubai, Dominican Republic, and Ecuador.

43.    On February 8, 2019, DIDANI was arrested by Dutch Authorities at the Schipol Airport in Amsterdam, Netherlands prior to boarding an outbound flight to Ecuador on suspicions of money laundering. DIDANI was in possession of several cell phones and a GPS tracker.  On February 15, 2019, DIDANI was released from Dutch custody after paying a fine and flew to Ecuador. GPS tracker.

44.    While in Ecuador, DIDANI communicated with several individuals, known and unknown, and discussed in depth methods of moving large quantities of cocaine using import/export companies and commercial shipping containers on maritime vessels traveling from South America to Europe. The DIDANI DTO has gained access to and created large import/export companies based out of South America to traffic the bulk amounts of cocaine in a concealed manner, often mixed

20

with legitimate cargo and transported within the aforementioned cargo containers
as well as paying corrupt port workers and foreign customs employees to assist in
getting the cocaine shipments onto and off of the shipping vessels undetected.

45.     On July 22, 2019, DIDANI traveled from Guayaquil, Ecuador to
Dubai, United Arab Emirates (UAE) to meet with additional members of the DTO.
These members have been identified as facilitators, cocaine distributors and
financiers for the DIDANI DTO who were brought in after the death of CC-2.
Investigators were able to confirm that the DIDANI DTO began receiving large
quantities of money from a newly acquired and identified financier for the
purchase and organizing of bulk cocaine shipments from South America to Europe,
more specifically Netherlands, Belgium and Spain.

46.     On August 11, 2019, Dutch Authorities seized 753 kilograms of
cocaine at the Port of Rotterdam, Netherlands. The shipment originated from
Guayaquil, Ecuador on July 23, 2019 upon a vessel, the Anisha R. of the
Mediterranean Shipping Company. The cocaine was found in container number
TTNU8089029 inside a shipment of "Bioban" bananas. The shipper of the bananas
was an Ecuadorian-based produce company called Bioexpor. The
consignee/receiver of the shipment was listed as Frubanal AG, a wholesale
distributor of produce located in Hamburg, Germany.

21

47.    Through lawfully obtained electronic data belonging to DIDANI and other members of DTO, investigators located emails from Frubanal AG to Bioexpor. These emails showed Frubanal AG requesting containers of "bioban" bananas be shipped to the Port of Rotterdam and the Port of Antwerp utilizing the MSC shipping company. Investigators also located photos of large quantities of kilogram-packaged cocaine being loaded into boxes of bananas. The boxes were marked "bioban" and displayed Bioexpor plastic wrap on the interior of the boxes. The kilogram packages were marked with a black semi-automatic pistol sticker on the top of each individual package. Additionally obtained photos showed pallets of the "bioban" banana boxes being loaded onto a shipping container. Pictures of container number TTNU8089029 and a reservation of the MSC vessel Anisha R. were also located. This intelligence was given to the DEA Country Office in The Hague, Netherlands and compared with the August 11, 2019, 753 kilogram of cocaine seizure. The companies, "bioban" packaging, dates, and identifiers on the packages of cocaine matched the previously described obtained photos of the cocaine packaging and banana boxes. The following four photos were taken by law enforcement following the 753-kilogram seizure on August 11, 2019, at the Port of Rotterdam.







48.   The following three photos were located and obtained through lawfully procured measures by investigators.



23

 

49.     In September 2019, DIDANI had communications with another Co-Conspirator (CC-3) of the DTO. Investigators have identified CC-3 purchasing multiple Kevlar reinforced "bulletproof" jackets for the DIDANI DTO on DIDANI's request. In September 2019, CC-3 purchased five Kevlar jackets for the DIDANI DTO utilizing straw purchasers. CC-3 previously purchased four Kevlar reinforced jackets for the DIDANI DTO utilizing the same straw purchaser method in March 2019. A "straw purchase" is a method described as utilizing individuals to make purchases on behalf of another individual. Investigators are aware that criminals often utilize this method of purchasing items that may be illegal or used for the purpose of committing a crime. This method allows criminals to avoid association and any documentation surrounding the purchase making it difficult to be traced by law enforcement. In addition to the straw purchase of the Kevlar jackets, DIDANI has discussed with CC-3 in depth details of the DIDANI DTO,

24

these details have included large shipments of cocaine that were organized by DIDANI that had been seized by authorities, DIDANI's large profits from successful cocaine shipments making it through to Europe and utilizing CC-3 to launder some of DIDANI's drug proceeds back into the United States.

50.     On February 17, 2020, DEA Detroit Agents shared legally obtained information with the DEA Country Office in The Hague, Netherlands and to the Dutch National Police Port Authorities. The information described a commercial cargo container that had been loaded with a cocaine shipment that was financed and organized by DIDANI and additional members of the DTO.

51.     On February 22, 2020, Dutch Port Authorities seized 14 large black duffle bags containing approximately 644 kilograms of cocaine from cargo container TTNU8638520 aboard the commercial cargo maritime vessel, CMACGM Jean Gabriel.



25

52.     In addition to the above cocaine seizure, DEA investigators have identified additional legally obtained information through cooperators and search warrants leading to the large bulk cocaine shipments financed, orchestrated and executed by the DIDANI DTO under the direction and operation of DIDANI. More specifically, investigators have provided actionable intelligence and linked the DIDANI DTO to other cocaine seizures. These seizures include approximately 1,000 kilograms of cocaine seized in the Netherlands on April 7, 2020, from a shipping container originating from Paita, Peru and 1,100 kilograms of cocaine in Bilbao, Spain on April 21, 2020, in a cargo container originating from Guayaquil, Ecuador.

## CONCLUSION

53.     The intelligence gathered by investigators regarding the DIDANI DTO, more specifically Ylli DIDANI displays the sophisticated and in-depth operations of a large-scale cocaine trafficking and money laundering organization.

54.     Based on the foregoing, I believe that probable cause exists that Ylli DIDANI (1) knowingly and unlawfully, conducted illegal acts in violation of Title 21, United States Code, Sections 841 and 846 (conspiracy to distribute controlled substances); (2) knowingly, intentionally and unlawfully conspired with members of a DTO known and unknown, to commit violations of Title 46, United States Code, Section 70503 (conspiracy to distribute controlled substances on board a

26

vessel subject to the jurisdiction of the United States); (3) aided and abetted

members of the DTO, known and unknown, in committing violations of Title 18,

United States Code, Sections 1956(a) and 2, (money laundering); and (4)

committed these offenses in the Eastern District of Michigan and elsewhere.

Respectfully submitted,

Brandon Leach
Task Force Officer
Drug Enforcement Administration

Sworn to before me and signed in my
presence and/or by reliable electronic means.

HON. KIMBERLY G. ALTMAN
UNITES STATES MAGISTRATE JUDGE

Date: March 26, 2021

27